UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

IN RE:                                        )
                                              )    CASE NO. 96-30842 (ASD)
ROBERT T. DILIETO and                         )
MICHELLE DILIETO,                             )    CHAPTER  7
                                              )
            DEBTORS                           )    RE: ECF NO. 184
                                              )

APPEARANCES:

Douglas S. Skalka, Esq.                    Attorney for Michael J. Daly,
Neubert, Pepe & Monteith, P.C.             Former Chapter 7 Trustee
195 Church Street, 13th Floor
New Haven, CT 06510

Kim L. McCabe, Esq.                        Attorney for Tracy Hope Davis, Esq.
Assistant United States Trustee            United States Trustee for Region 2
Office of the United States Trustee
Giaimo Federal Building
150 Court Street, Room 302
New Haven, CT 06510


Robert T. DiLieto and                      Debtors, *Pro Se*
Michelle DiLieto,
160 Notch Hill Road
North Branford, CT 06471



**MEMORANDUM OF DECISION DENYING APPLICATION OF MICHAEL J. DALY**
**(FORMER CHAPTER 7 TRUSTEE)**
**FOR ALLOWANCE OF COMPENSATION PURSUANT TO 11 U.S.C.§330**

ALBERT S. DABROWSKI, United States Bankruptcy Judge

## I. INTRODUCTION

Michael J. Daly (hereinafter, the "Former Trustee") the duly-appointed trustee for the Chapter 7 bankruptcy estate of Robert T. DiLieto and Michelle DiLieto (hereinafter, jointly, the "Debtors"), who served in that capacity in this bankruptcy case for over thirteen years, has filed an application for compensation for his services as trustee. Objections to the Former Trustee's application have been filed by the Debtors and by Kim L. McCabe, Esq., Assistant United States Trustee on behalf of Tracy Hope Davis, Esq., the United States Trustee for Region 2 (hereinafter, the "U.S. Trustee").

It is undisputed, and cannot be disputed, that the Former Trustee performed certain activities that were necessary in the administration of this bankruptcy estate. *See*, *e.g.*, 11 U.S.C. §704 ("Duties of trustee"), *inter alia*. However, it is also clear that he failed to prepare, maintain and submit in support of his application, contemporaneous time records and that the non-contemporaneous time records actually filed in support of his application reflecting 260.1 hours of services performed suffered from "lumping", duplicate entries, mistakes and excessive and unnecessary time. Even if the flaws and deficiencies in the time records filed with the Court were unintentional on the part of the Former Trustee, they still reflect a degree of negligence which, when coupled with their non-contemporaneous nature warrant a substantial reduction in or even complete denial of, the monetary fee award sought in the application.

However, and of great import in this matter, an earlier version of the Former

2

Trustee's time records reflecting 497.50 hours not filed with the Court, but transmitted to critical parties, was replete with false entries.  A substantial number of hours in these time records reflect not only gross negligence, but far worse, intentionally false statements, as they claim substantial activity for services not performed at all, or performed by others. Compounding the problem for the Former Trustee is that these false claims of trustee activity were submitted to the parties as part of a scheme to coerce their consent, or, at a minimum, avoid their objection to the Former Trustee's application for compensation, and, as explained hereinafter, to "pull the wool over the Court's eyes" if ultimately filed with the Court, and subjected to the Court's independent examination. The Former Trustee's intent and conduct in preparing and then submitting these false time records to the parties, by itself, warrants complete denial of the application.

Finally, and in addition to the above, the Former Trustee's behavior  in this case was attended by repetitive instances of unprofessional, inappropriate, and, at times crude, abhorrent behavior and published comment directed towards Michelle DiLieto and counsel. In the early stages of this bankruptcy case the Former Trustee exhibited good judgment and appears to have properly administered the case in accordance with appropriate standards.  However, as the case progressed, and particularly after he learned of Michele DiLieto's medical malpractice action (hereinafter referred to as the "State Court Action"), the Former Trustee transformed from a fiduciary to a self-interested advocate seeking to feather his own nest, who, in his own words, declared "war"[1] against Michelle

---

[1] *See* e-mail from the Former Trustee to the Successor Trustee recited in part at page 21, *infra*, stating, *inter alia*, "[i]f Mrs. Dilieto wants a WW she can have one."

DiLieto. The Former Trustee's repugnant conduct, when coupled with the other circumstances set forth above, makes the remedy of a complete denial of the application particularly appropriate.

In accordance with the above, and upon the facts and for the reasons discussed in more detail hereinafter, the Court concludes that the Former Trustee's application for compensation must be denied in full.

## II. PROCEDURAL BACKGROUND

On March 20, 1996 (hereinafter, the "Petition Date"), the Debtors commenced this bankruptcy case by filing a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code. On March 27, 1996, the Former Trustee was appointed the Chapter 7 trustee for the bankruptcy estate and served as such until his resignation on July 27, 2009.[2]  On July 28, 2009, Ronald I. Chorches was appointed as the successor trustee, (heretofore and hereinafter, the "Successor Trustee").  On March 21, 2011, the Former Trustee, through his counsel, Douglas S. Skalka, filed an *Application of Michael J. Daly, Chapter 7 Trustee for Final Allowance of Compensation Pursuant to 11 U.S.C. §330* (hereinafter, the "Fee Application"), ECF No. 184, seeking $80,000[3] for 260.10 hours for

---

[2] The Former Trustee first took a leave of absence and then, on July 27, 2009, resigned during the course of what had begun as a routine field audit conducted of the Former Trustee's accounts by the Office of U. S. Trustee.  He was officially terminated from the case on July 29, 2009.  On July 12, 2011, the Former Trustee entered into a plea agreement with the United States Department of Justice in which he agreed to plead guilty to a one-count information charging him with embezzlement by a court officer in violation of Title 18, U.S.C. §645, in connection with another, unrelated bankruptcy case.  As of the date of this decision, the Former Trustee is awaiting sentencing.  Former Trustee's Exh. F.  He resigned from the Connecticut Bar on August 15, 2011.

[3] The time records actually show a fee request of $73,810.  No explanation is given for the discrepancy between the $80,000 requested in the application and the $73,810 requested in the time records.

performance of his duties as trustee. On March 31, 2011, and April 1, 2011, the Debtors

filed objections entitled, *Motion to Object to Application of Michael J. Daly, Chapter 7*

*Trustee for Final Allowance of Compensation Pursuant to 11 U.S.C. §330 and Request for*

*Evidentiary Hearing and a Motion to Amend Motion to Object . . . to the Former Trustee's*

*Fee Application* (hereinafter, the "Debtors' Objection"), ECF Nos.198 and 199.

As an apparent consequence of the Debtors' Objection, the U.S. Trustee, pursuant

to Rule 2004, Federal Rule of Bankruptcy Procedure,[4] conducted a series of examinations

of the Former Trustee, his personal attorney Carol Felicetta, and the Debtors' personal

injury attorney Ronald S. Margol; and the Former Trustee conducted a Rule 2004

examination of the Successor Trustee.  In addition, in response to subpoenas, the various

parties produced numerous documents, including letters, time records and e-mails sent

and received in connection with the case.  On July 12, 2011, the U.S. Trustee filed her own

*Objection to Application of Michael J. Daly, Chapter 7 Trustee for Final Allowance of*

*Compensation Pursuant to 11 U.S.C. §330* (hereinafter, the "U.S. Trustee's Objection"),

ECF No. 250.  On August 2 and 3, and September 26, 2011, evidentiary hearings

(hereinafter, the "Fee Hearings") were held to consider the Fee Application and the

Debtors' and U.S. Trustee's Objections thereto.  Post-trial briefs have been filed by the

---

[4] Fed. R. Bankr. P. 2004 provides, in pertinent part:

(a)   *Examination on Motion.*  On motion of any party in interest, the court may order
the examination of any entity.

(b)   *Scope of Examination.*  The examination of an entity under this rule . . . may
relate only to the acts, conduct, or property or to the liabilities and financial condition of
the debtor, or to any matter which may affect the administration of the debtor's estate . .
. .

parties and no requests for oral argument have been made. The Fee Application is now ripe for decision.

### III. FACTUAL BACKGROUND

The Court finds the following facts on the basis of the files and records of this bankruptcy case, and the evidence, testimonial and documentary, admitted at the Fee Hearings.

***A. Administration of the Bankruptcy Case Prior to the Former Trustee's Knowledge of the State Court Action.***

The Former Trustee's administration of this bankruptcy estate during the first three years was relatively uneventful and routine, the relevant aspects of which can be briefly stated. Among the initially scheduled assets of the Debtors' bankruptcy estate was a home located at 215 Upson Terrace, New Haven, Connecticut, a pending workers' compensation claim of Mr. DiLieto that was exempted from the bankruptcy estate, and a pending personal injury lawsuit against Crossroads Development Company (hereinafter, "Crossroads"), brought by the Debtors as a result of an injury allegedly suffered by Mr. DiLieto. Although the Former Trustee abandoned the bankruptcy estate's interest in the Debtors' home and the Debtors received their discharge on July 9, 1996, the bankruptcy estate remained open for the Former Trustee to administer any assets that might be recovered as a consequence of the Debtors prevailing in their personal injury suit against Crossroads. However, the Crossroads lawsuit ultimately resulted in a defendants' verdict on March 15, 2000, and therefore, produced no assets for administration in the bankruptcy case.

6

**B. Administration of the Bankruptcy Case and The Former Trustee's Conduct After He Learned of the State Court Action.**

The Former Trustee's administration of this bankruptcy estate after he learned of another lawsuit brought by the Debtors, and his conduct related thereto, was far from uneventful and routine. Appreciation of the full import of that conduct as it relates to the Fee Application requires the detailed recitation which follows.

In March 1999, three years into the case, the Former Trustee was advised by attorneys for Michele DiLieto that she (and for a time Mr. DiLieto), were plaintiffs in a medical malpractice lawsuit that had been filed in the Connecticut Superior Court (hereinafter, the "Superior Court") in January 1997. *Michelle DiLieto v. County Obstetrics & Gynecology Group, P.C.*, No. CV-97-0150435S (heretofore and hereinafter, the "State Court Action"). In the State Court Action, Mrs. DiLieto alleged she had unnecessary surgery to remove her reproductive organs and pelvic lymph nodes, resulting in permanent nerve and other damage, following a mis-diagnosis of cancer.

The State Court Action was not listed as an asset on the Debtors' bankruptcy schedules although the injury which gave rise to the underlying claim, had arisen prior to the Petition Date in 1996. The Former Trustee was notified of the pendency of the State Court Action as a consequence of the defendants in that lawsuit, among them Yale University School of Medicine (hereinafter and collectively, "Yale"), having filed in the Superior Court a motion to dismiss the State Court Action on the basis that the Debtors were not the proper parties to the litigation; that the State Court Action should have been brought in the name of the Former Trustee; that Mrs. DiLieto had intentionally concealed

the existence of the lawsuit from the Bankruptcy Court; and, that the statute of limitations for the filing of the lawsuit had expired.

In order to defend against Yale's motion to dismiss, Rodney S. Margol of Margol & Pennington, P.A. of Florida (hereinafter, "Attorney Margol"), and Garrett M. Moore of Moore, O'Brien, Jacques & Yelenak (hereinafter, "Attorney Moore"), the Debtors' attorneys in the State Court Action, filed in the Superior Court, with the Former Trustee's consent, a *Motion to Add or Substitute Trustee as Party Plaintiff.*  In connection therewith, the Former Trustee executed (with some modification in the wording by him), an *Affidavit*, submitted with the motion to the Superior Court, in which he stated, in relevant part,

> I have reviewed the circumstances surrounding Michelle DiLieto's failure to identify her potential claims against various health care providers arising out of her May 3, 1995, surgery and, as the Chapter 7 trustee in the DiLieto case, I have concluded that there was no requirement for Mrs. DiLieto to identify this matter as an asset at the time she listed her assets, and she had a good faith basis for not listing it.

Former Trustee's Ex. C.

The Former Trustee also asserted in the *Affidavit* that since the proofs of claim filed in the bankruptcy case were estimated to be no more than $37,200, Mrs. DiLieto had a personal interest in the outcome of the State Court Action, and that dismissal of that lawsuit would be highly prejudicial to the bankruptcy estate and its creditors.  *Id.*


While Yale's motion to dismiss was pending, the Former Trustee filed motions with this Court seeking the appointment of Debtors' counsel in the State Court Action to represent the Former Trustee in that lawsuit in lieu of the Debtors. Obtaining the approval

8

of such appointments proved time-consuming because of the attorneys' prior representation of the Debtors, and Yale strongly opposed their appointment. In June 1999, however, this Court appointed Attorney Margol as the Former Trustee's special counsel and Attorney Moore as his local Connecticut special counsel. In February 2000, C. Rufus Pennington (hereinafter, "Attorney Pennington"), a law partner of Attorney Margol was appointed to assist in the State Court Action. Later, following a decision in the first trial of the State Court Action, William F. Gallagher (hereinafter, "Attorney Gallagher") of The Gallagher Law Firm, was appointed to handle an appeal of a defendant's verdict. The Court approved compensation for each counsel on a contingency basis, with counsel agreeing to apportion their respective shares. Thereafter, in 2003, Mrs. DiLieto hired Steven D. Ecker (hereinafter, "Attorney Ecker") as her personal attorney to litigate certain issues related to the lawsuit that were not property of the bankruptcy estate. Attorney Ecker was also engaged on an hourly basis by Attorney Margol to assist him and Attorney Gallagher.

Following an evidentiary hearing, on January 31, 2000, the Superior Court (Sheldon, J.) ruled in a lengthy opinion that Mrs. DiLieto had no knowledge of the inappropriateness of naming herself as plaintiff in the State Court Action, finding her actions were the result of an honest mistake: that she had acted in good faith in believing she had no claim after several attorneys had rejected her request for representation and without negligence in believing that the bankruptcy case was over. The Superior Court, however, also ruled that Mrs DiLieto lacked standing to proceed with the lawsuit in her own name, quoting from 11 U.S.C. §554 that "[u]nless the court orders otherwise, property of

9

the estate that is not abandoned under this section and that is not administered in the case

remains property of the estate." *DiLieto v. County Obstetrics and Gynecology Group, et al.*,

No. CV-970150435S, 2000 Conn. Super LEXIS 231 at *9, n.4 (January 31, 2000).  Finally,

the Former Trustee's motion to be substituted as party plaintiff in the State Court Action

was granted and Yale's motion to dismiss was denied. Former Trustee's Ex. D.

The State Court Action was strenuously litigated. Dozens of depositions were taken;

the Debtors were each deposed four times.  Trial commenced on April 4, 2000 with jury

selection, and after the jury was seated, the trial proceeded over an eleven week period.

After days of deliberation, the jury announced that it was hung as to certain defendants but

found in favor of Yale.  A mistrial was declared as to the defendants concerning whom the

jury could not arrive at a verdict and the Former Trustee appealed the verdict in favor of

Yale.  On July 29, 2003, the Connecticut Supreme Court reversed the verdict in Yale's

favor and remanded the case for a new trial. *DiLieto v. County Obstetrics and Gynecology*

*Group, P.C.,* 265 Conn. 79 (2003).

The second trial commenced on October 4, 2005 and after many weeks concluded

with a jury verdict in the amount of $5.2 million dollars in favor of Mrs. DiLieto against all

defendants. Following the filing of post-trial motions and a hearing, the Superior Court

entered its Memorandum of Decision and Final Judgment on July 14, 2006 upholding the

jury's verdict and awarding prejudgment interest in the amount of $5,886,113.[5] While, Yale

and the other defendants appealed the verdict and the award of prejudgment interest to

---

[5] The Debtors had served each of the defendants an Offer of Judgment within eighteen months
of the filing of the lawsuit (but before the Former Trustee was substituted as Plaintiff), and were held
entitled to prejudgment interest at 12%.

10

the Connecticut Supreme Court, the Former Trustee was now administering a bankruptcy estate he expected to be in excess of $11 million dollars with obvious potential for sizable trustee compensation, especially if the Former Trustee's fee was calculated strictly on a commission basis.

During the various stages of the lengthy litigation of the State Court Action, the parties participated in numerous formal and informal, but unsuccessful, attempts to settle the litigation. It was during one of these periods of negotiations with Yale, shortly after the Superior Court's $11 million dollar judgment, that the seeds which would eventually give rise to the fee dispute in this matter were planted. In a letter dated November 22, 2006, Michelle DiLieto sent a letter to the Former Trustee asking for information concerning his fees and expenses so that she would be "fully informed as to my obligation in terms of debt and interest to the Bankruptcy Court, and to you the Trustee."   More significantly, Mrs. DiLieto also asked that the Former Trustee advise her of  "the number of hours you have spent on my case and your itemized 'out-of-pocket' expenses to help me make my decision."   U.S. Trustee Ex. CC.

The Former Trustee did not respond to this request until January 3, 2007, when in a letter he did not provide her with information as to the amount of time spent on the case other than to say "it is one of the more time consuming cases in my office."   He also implied that time records were irrelevant because "[m]y fees are statutory fees based on the amount of money that I as trustee disperse to all creditors."   He went on to explain that in her case the calculation of his fee was determined both by disbursements to creditors and to her attorneys as administrative expenses.   Former Trustee's Ex. E.   In a similar

11

vein, more than a year later, in response to an inquiry by Attorney Margol, the Former

Trustee again indicated in an e-mail dated October 14, 2008, that his fee was based upon

the amount of distribution to creditors: "When calculating my commission, I am paid on

unsecured claims, interest and professional fees and expenses. So to complete my

commission, it would be the total of the unsecured claims and interest plus your fees and

costs applied against the formula above." U.S.Trustee Ex. DD.

The Former Trustee would repeat this theme in many e-mails sent over the next

several years, claiming entitlement to a full commission, and stating he would not

negotiate, "because but for me the case would be dead and I have had to jump through

hoops especially at the beginning." *Id*. Further, in an obvious effort to assure he would be

paid the maximum commission possible, the Former Trustee instructed Attorney Margol,

"I don't want you to negotiate your fees and costs." *Id*:

> Ms. McCabe: Did Mr. Daly give you any reason why he did not
> want you to negotiate your fees?
> Attorney Margol: Yes. Because his view was that his
> commission, as trustee, would be based on the amounts that
> he distributed, including the amounts that he paid to the
> attorneys.

Tr. 8/2/11 pp. 123-126.

While oral argument before the Connecticut Supreme Court took place on

September 15, 2008, the parties thereafter continued to engage in occasional settlement

negotiations, and the Debtors remained concerned as to what trustee's fees would have

to be paid out of any settlement. In a letter dated October 22, 2008 to Attorney Margol,

Attorney Ecker asked for more fee information concerning the Former Trustee's fees,

12

including "[t]he amount that Mr. Daly claims that he is (or will be owed) for his services as trustee, and his time records." U.S. Trustee Ex. EE.   Not having received a response to this letter (although it was forwarded to the Former Trustee), Attorney Ecker sent another letter directly to the Former Trustee dated November 25, 2008, indicating that "there is likely to be disagreement with regard to at least some of the disbursements that you, as Trustee, may wish to make out of any recovery," and asks if they can "sit down and discuss all proposed disbursements (including your fee)" in order to try to avoid "unnecessary contention and litigation."  U.S. Trustee Ex. FF.

In response to this last communication, a copy of which was sent to Attorney Margol, the Former Trustee immediately sent a one line e-mail to Attorney Margol, "Told you we were her next targets - I should have shut this down in 1998." U.S. Trustee Ex. FF. On that same day, Attorney Margol advised Attorney Ecker that he had a telephone conversation with the Former Trustee in which the Former Trustee agreed to discuss the issues separating  them.  Attorney Margol also reported to Attorney Ecker that the Former Trustee told him that he could have refused to pursue the State Court Action because it had not been listed on the bankruptcy schedules and, that if Mrs DiLieto "formally" objects to his legitimate fees and distributions, he will hire counsel and then pursue payment out of the bankruptcy estate as an administrative expense (meaning that the costs would be paid for by Mrs. DiLieto).  U.S. Trustee Ex. K.

A week or so later, the e-mails were flying fast and furious: The Former Trustee wrote to Attorney Margol on December 6, 2008, noting that "If [Attorney] Ecker thinks I am going to put together a package like that he is nuts."  The Former Trustee threatened that

13

if the Connecticut Supreme Court remanded the State Court Action for a third trial he would extricate the bankruptcy estate from it by abandoning the lawsuit as of little, if any value to the bankruptcy estate, adding "I am sure Yale will be over the improper party like white on rice." U.S. Trustee Ex. K.  He also indicated that he had advised the other Chapter 7 panel trustees about Attorney Ecker and that they will not allow him to be special counsel on their cases in the future. *Id.*

The Former Trustee's threat to abandon the State Court Action produced the result he was obviously seeking as, that same day, Attorney Margol responded by indicating his distress over the breakdown in the relationship between Michelle DiLieto and the Former Trustee, adding that he has pursued the State Court Action for twelve years because it is meritorious and cannot understand why the Former Trustee would not pursue it in the event of a remand.  *Id*.  Interestingly, at this time Attorney Margol appears to have still believed, based upon the Former Trustee's e-mail to him of October 14, 2008, that trustee's fees are paid strictly by commission; he concludes his e-mail by stating "Ultimately I still believe we will get this resolved. There is a statute and it would seem to address the Trustee fee issue.  If there is an ambiguity the Judge will decide it."  *Id*.

Attorney Margol's hope that the fee dispute "ultimately . . . will get . . . resolved" was immediately dashed, as that same day, the Former Trustee, attaching a copy of Attorney Ecker's November 22, 2008 letter in which Attorney Ecker expressed a desire to discuss the fee dispute, transmitted an e-mail to the panel of Chapter 7 trustees, stating:

> Can you even believe this - if it wasn't for me this woman
> would not even have a case because she never scheduled it
> and I had to break my butt to keep it alive . . . . The witch has

14

> cried to my face cause she is suing because she doesn't have
> cancer and I do . . . . If the supreme court remands I am going
> to find a way to abandon it  by saying that it has no value and
> file a motion to withdraw – Then Yale will go nuts with their
> improper party action again -

U.S.Trustee Ex. J.

The next day, December 7, 2008, in response to Attorney Margol's e-mail to him,

the Former Trustee e-mailed back:

> But I don't want to put time into this, after saving everybody's
> but[6] and jumping to everyone's command and then have this
> ungrateful sorry sack of trash - and her lawyer - start with time
> sheets, and all this other documentation.  I should have shut
> this down earlier because the benefit to creditors is so
> minimal. And there is no way I feel sorry for this woman
> because she is nothing but a greedy ungrateful miserable
> witch. . . . But if there is a remand - I will get court permission
> to get out and I am sure Yale won't let her continue.  Like all
> businesses, Trustee's have to make value decisions about
> which cases to pursue and when to cut their losses . . . .

U.S. Trustee Ex. K (footnote added).

To this Attorney Margol responded by reminding the Former Trustee that at this

point the "losses" were his in terms of money advanced and time spent.  He suggested that

if the Former Trustee could no longer tolerate Mrs. DiLieto, he could resign as trustee and

have someone else appointed to replace him.  The Former Trustee answered by stating

that there was no point in replacing him because he spoke to the other panel trustees and

they would not pursue the State Court Action either.  Knowing Attorney Margol's concern

as to the fate of the State Court Action after having invested so many years of his time and

---

[6] Many of the Former Trustee's e-mails quoted from herein contain spelling and grammatical
errors.  In order to preserve the tenor of the e-mails, they will not be corrected or annotated with the use
of "sic."

15

money, the Former Trustee reminded him again that "If the court remands, I will abandon

the claim and whatever rights (which I think are none) revert to Mrs. DiLieto and you can

figure out  how it plays - I have spoken with all of the other members of the panel and they

agree."  U.S. Trustee Ex. K.

On December 16, 2008, Attorney Ecker wrote a letter to the Former Trustee in

which he acknowledged the Former Trustee's willingness to negotiate their disagreements

over disbursement/fee-related issues. However, Attorney Ecker then renewed his request

for time records and other supporting documentation adding:

> At the time we spoke, as I told you, I had not yet had an
> opportunity to research the bankruptcy law governing the
> trustee's fee in a case like ours. I have now researched the
> issue enough to know that the trustee's fee is <u>not</u> fixed by
> statute; rather the <u>maximum</u> is fixed by statute.  It turns out that
> the fee entitlement which you characterize as certain and
> indisputable is, in fact, open to dispute.

U.S. Trustee Ex. RRR.

Apparently, as a consequence of this development, the correspondence took an

even more dramatic turn when, on December 17, 2008,  the Former Trustee sent an e-mail

to Attorney Ecker through his assistant, Jennifer T. Nye, in which he again reiterated his

unwillingness to supply time records and other documentation of his fees:

> Steve - I am not expending any additional time on this matter
> until there is something to actually discuss. As I told you, I
> think that Mrs. Dileto needs something to occupy her time and
> I am not going to engage in needless discovery to help fill her
> empty life. . . . I believe that the fact that I had to do a lot of
> work in this case, but for my involvement and dropping
> everything Mrs. Dilieto would be without a cause of action and
> the other involvement I am entitled to my fee.

U.S. Trustee Ex. L.

What is most significant about this e-mail, however, are its recipients. In addition to counsel involved in the State Court Action and Mrs. DiLieto, the Former Trustee transmitted copies to all of the Hartford, Connecticut Chapter 7 panel trustees, the Office of U.S. Trustee and, most significantly, to Attorney Penny Q. Seaman, of the Law Firm of Wiggin & Dana, the lead defense attorney for Yale and the other defendants in the pending State Court Action.

As a result of this e-mail, Attorney Ecker immediately sent the Former Trustee a letter demanding that the Former Trustee cease disparaging his client and that he resign as trustee from the bankruptcy case. Attorney Ecker labeled the Former Trustee's "cc" to opposing counsel in the State Court Action "unnecessary and destructive." U.S. Trustee Ex. M. At the Fee Hearing, Attorney Margol explained the concern over the Former Trustee sending a copy of the e-mail to his opposing counsel:

> So it just took away the bargaining leverage that I thought we had since we had a [trial court] verdict. We had what I thought was a persuasive Supreme Court argument, but the rug had been pulled out from under us.

Tr. 8/2/11 p. 151.

Attorney Ecker also testified at the Fee Hearing regarding the "cc" to opposing counsel:

> It was just disastrous from my point of view . . . . Well, you never want the opposition to know that there's a conflict or a potential divide or a problem on - - when there's, you know, you have to have a united front . . . . I was also growing concerned that Mr. Daly might do something irrational, like, settle the case out from under my client.

17

Tr. 9/26/11 p. 121-122.

Shortly thereafter, on or about December 29, 2008, the Former Trustee advised Attorney Margol by telephone that he wanted all settlement discussions that were then ongoing to cease and that they wait for the Connecticut Supreme Court to rule. U.S. Trustee Ex. Q;  Tr. 8/2/11 p. 154 -157. This was confirmed in an e-mail sent by Attorney Margol to the Former Trustee.  U.S. Trustee Ex. O.  Attorney Margol also communicated the Former Trustee's decision to Attorney Ecker, who then sent a letter to Attorney Margol dated December 30, 2008, expressing his concern over the consequences of ceasing the negotiations – namely, jeopardizing the chance of any recovery, in the face of the real possibility in his mind that they could lose the case before the Supreme Court.  U.S. Trustee Ex. Q; Tr. 9/26/11 pp.127-130.

On January 2, 2009, in an e-mail to Attorney Margol, the Former Trustee withdrew his direction that negotiations cease (he claimed it was a "misunderstanding") but then returned to his recurrent themes: disparaging Mrs. DiLieto; reminding him that the case was still pending only because of his actions and claiming again that his fee is or should be based upon commission:

> I think she is a pretty pathetic individual whose sole reason for existing is this lawsuit . . . . I have previously provided the outline of compensation, it is based on my disbursements to creditors, plus post petition interest and the disbursements to you for fees and expenses. . . . They all have to keep in mind that while this is the maximum fee, given the fact that I can bring on a number of witness that would tell you professionally and personally, I could have walked away and left you hanging rather than jumping through hoops when I got a call from you buddy in Florida - So dropping everything to be involved in this

18

> case, they type of involvement and the time would probably
> justify the maximum fee.

The Former Trustee also issued a warning concerning Attorney Ecker, which he must have

assumed Attorney Margol would pass on:

> [M]any attorneys feel he is backstabbing and I will not give him
> any work in the future and have *instructed* all my colleagues
> likewise. . . . [H]e can forget abut being involved in any PI with
> bankruptcy trustee's in the future . . . . But that is neither here
> nor there because you and Bill [Attorney Gallagher] will deal
> with him. . . . (emphasis added).

U.S. Trustee Ex. Q.

In the months following this last e-mail, the parties focused on settlement offers until

the Former Trustee resigned on July 27, 2009, and the Successor Trustee was appointed.

On June 29, 2010, the Connecticut Supreme Court in a unanimous decision

rejected the defendants' appeal and affirmed the Superior Court's award of prejudgment

interest but limited prejudgment interest to the period following January 27, 2000, the date

the Former Trustee was substituted as plaintiff. *DiLieto v. County Obstetrics and

Gynecology Group,* P.C., 297 Conn. 105 (2010). The defendants' Motion for Partial

Reconsideration and *En Banc* review was subsequently denied. The Successor Trustee

eventually received from the State Court Action defendants the total sum of $9,255,140.

On August 30, 2010, the Former Trustee, having heard that the Successor Trustee

would be filing a final account soon, and desiring to ensure that the Successor Trustee had

his complete time records, sent an e-mail to the Successor Trustee. In that e-mail, the

Former Trustee, reiterating his themes, advised the Successor Trustee that:

19

> [he had] attended 2 trials, several settlement conferences,
> Supreme Court Arguments and at the beginning of the case
> had to really fight.  If it wasn't for me the case would have
> been dismissed because Mrs. DiLieto had no standing to file
> the action . . . . Mrs. DiLieto just has nothing else going on in
> her life and traces everything that happens to this lawsuit.

U.S. Trustee Ex. PPP.

The Successor Trustee had a copy of the Former Trustee's time records (showing 97.70 in total hours worked on the case) that had previously been entered in the Bankruptcy Management Solutions, Inc., (hereinafter, "BMS")[7] system.  U.S. Trustee Ex. S.  However, the Former Trustee advised that he had "quite a bit of time" that he had not entered on the BMS system. U.S.Trustee Ex. PPP.  The Successor Trustee responded advising the Former Trustee that there was a little bit of time before he had to supply any missing fee information. *Id*. The Former Trustee replied stating he would input the time and deliver it to the Successor Trustee. *Id*.

Meanwhile, remaining unresolved was the issue of Mrs. DiLieto's personal entitlement to distribution of post-judgment interest. On September 28, 2010, Attorney Ecker filed a motion with this Court seeking to compel the Successor Trustee to abandon the bankruptcy estate's interest in the post-judgment interest in light of the fact that the bankruptcy estate had more than enough funds on hand to pay all creditors of the estate in full, plus interest. At the same time, Attorney Ecker also moved for an order approving

---

[7] BMS is a computer generated software and support services company that seeks to automate bankruptcy administration. One of its products is computer software that enables a bankruptcy trustee to enter and maintain time records.

an interim distribution of surplus funds to Mrs. DiLieto.[8]

On October 15, 2010, the Successor Trustee filed his own *Motion to Abandon Partial Claim of the Estate* (hereinafter, the "Motion to Abandon") with respect to the estate's interest in post-judgment interest. In fact, following the Successor Trustee's filing of additional objections to claims several months earlier (on the grounds that they were debts of Mr. DiLieto and not of Mrs. DiLieto), the Bankruptcy Court claims register indicated that there were only two prepetition claims remaining to be paid in this bankruptcy estate (not including professional fees), totaling slightly more than ten thousand dollars, plus post-petition interest. The Successor Trustee also filed a *Motion to Pay Surplus to Debtor Michelle DiLieto* and an *Application to Pay Compensation to Special Counsel* [Attorneys Margol, Moore, and Gallagher (hereinafter, the "Motion to Pay Surplus and Application to Pay Special Counsel") on a contingency basis as previously approved by the Court and as apportioned by agreement among the attorneys.  The hearings on each of these Motions were initially scheduled by the Court to be heard on November 17, 2010.

The fee situation heated up again after the Successor Trustee sent the Former Trustee a letter dated October 29, 2010, asking the Former Trustee for his completed time records by November 3, 2010, so that the court-appointed bankruptcy estate accountant could timely complete a tax analysis.[9] The letter also informed the Former Trustee that

---

[8] As a result of the Successor Trustee's motions and actions in the next paragraph, these motions filed by Attorney Ecker did not go forward.

[9] Timely consideration and approval in 2010 of the Motion to Pay Surplus and Application to Pay Special Counsel was of considerable concern to counsel in the State Court Action as they believed they

both Mrs. DiLieto and her attorney (Ecker) were going to object to **"any"** award of fees to him. The Successor Trustee added, "Of course, I will incorporate in any final report any compensation for you which you are seeking." U.S. Trustee Ex. S. Attached to the letter was a copy of the Former Trustee's BMS time records, showing 97.70 total hours worked on the case. *Id*.

In his e-mailed response, the Former Trustee said he did not think he could meet the deadline for submitting the balance of his fees "given the short lead." He reiterated that "[w]ith respect to Attorney Stephen Eckert and DiLieto – without my work there would be no claim." He further advised the Successor Trustee that he was

> retaining Reid & Riege, P.C. to represent me and I have instructed them to object to all motions scheduled for 11/17/2010 absent an agreement. One misstatement does not negate the work that I have done, the benefit that I have given to the creditors of the estate and especially to Mrs. DiLieto because absent my involvement, there would be no claim. . .. If Mrs. DiLieto wants a WW she can have one. I hope this is not necessary.

U.S.Trustee Ex. S.

On November 8, 2010, the Successor Trustee sent an e-mail to the Former Trustee's newly-engaged attorney, Carol Felicetta (hereinafter, "Attorney Felicetta"), asking for any additions to the Former Trustee's time records. Attorney Felicetta responded by stating that the Former Trustee's "BMS records are probably only a fraction of his actual time." U.S.Trustee Ex. OOO. Two days later, the Former Trustee notified the Successor Trustee: "Ron completed Time Sheets. I assume Carol [Attorney Felicetta] will

---

would enjoy significant tax advantages by their receipt of compensation in 2010.

be in touch regarding the position I have to take next week [at the hearing]." U.S. Trustee
Ex. R.  A copy of these revised time records were e-mailed first to the Successor Trustee
and thereafter by Attorney Felicetta to Attorneys Ecker and Margol.  Attorney Felicetta, in
her e-mail  to Attorney Ecker on November 15, 2010, states: "Steve, Attached please find
Mike Daly's time records as you requested." U.S. Trustee Ex. E.  The revised time records
now showed that the Former Trustee worked 497.5 hours on the case, a five-fold increase
of approximately 400 hours compared to the BMS time records.  *Id.*

As a consequence of these revised time records, the Successor Trustee determined
not to submit the Former Trustee's fee application with the Final Account but insisted that
they be submitted in a separate application. Tr. 9/26/11 p. 21. Upon his examination of the
revised time records, Attorney Ecker found them to be "beyond preposterous."  U.S.
Trustee Ex. SSS. The revised time records also precipitated a dispute between Attorney
Felicetta and Attorney Margol over whether Attorney Margol disclosed attorney/client
information that led Attorney Ecker to claim that the revised time records were "falsified."
U.S. Trustee Ex. V and W.

The Former Trustee, through his then counsel[10], continued to pursue objections to
Successor Trustee's Motion to Abandon, Motion to Pay Surplus and Application to Pay
Special Counsel, notwithstanding the fact that the Successor Trustee had set aside

---

[10] After the hearing on November 17, 2010, Attorney Felicetta withdrew her representation of the
Former Trustee when it became apparent that she had a conflict of interest.  *See* Letter from Attorney
Ecker to the Successor Trustee (Ronald Chorches) dated November 11, 2010, U.S. Trustee Ex. SSS.
Attorney Douglas S. Skalka of Neubert, Pepe & Monteith, P.C. represented the Former Trustee
thereafter.

23

sufficient funds to satisfy the Fee Application, if approved.[11]  On November 17, 2010, at

the scheduled hearing, the Former Trustee's attorney advised the Court that all the matters

were contested.  As a result, the hearing was continued to December 8, 2010.  The Former

Trustee later testified at the Fee Hearings that he was not motivated to seek this

continuance in order to pressure the parties to reach agreement with him on his fees;

rather, he was concerned about the terms of the proposed fee awards to others and the

possible abandonment of the estate's interest in the post-judgment interest. However, none

of the e-mails from him or his attorney during this time period mentioned these concerns.

Nor did witnesses at the Fee Hearing indicate that the Former Trustee or his attorney

mentioned these concerns to them.  For example, an e-mail sent by Attorney Felicetta to

Attorney Moore on November 15, 2010, stated: "Garrett, I have been retained to represent

Mike Daly in this matter concerning his trustee fees. It is my understanding that Mrs.

DiLieto is intending on objecting to any compensation to Mr. Daly." U.S. Trustee Ex. U.

Ultimately, at the continued hearing on the Successor Trustee's Motion to Abandon,

Motion to Pay Surplus and Application to Pay Special Counsel, these motions proceeded

without objection. In an Order dated December 15, 2010, Attorney Margol received an

award of fees of $1,480,822.40 plus expenses of $818,160.85, Attorney Moore was

awarded $740,411.20, plus expenses of $2,298.36, and Attorney Gallagher was awarded

$863,813.06 plus expenses of $3,989.57. The Court also approved the Successor

---

[11] In a letter dated November 12, 2010, to Attorney Ecker, the Successor Trustee set out his
analysis of proposed distributions from the bankruptcy estate, indicating an estimated maximum escrow
for Chapter 7 trustee fees of $176,168.91, based upon the commission schedule set forth in Bankruptcy
Code §326(a). Former Trustee's Ex. I.

Trustee's Motion to Abandon the bankruptcy estate's interest in post-judgment interest,
and the Motion to Pay Surplus to Michelle DiLieto.

On March 11, 2011, upon a motion filed by the Successor Trustee, the Former
Trustee was ordered to file a fee application with this Court no later than March 21, 2011.
On March 21, 2011, the Former Trustee filed the Fee Application seeking therein a final
allowance of compensation for services rendered as Chapter 7 trustee for the period from
March 20, 1996 through July 27, 2009, of $80,000.00.  Attached to the Fee Application
were time records, revised once more, this time indicating that the Former Trustee had
worked a total of 260.10[12] hours on the case.  He sought payment at hourly rates that
ranged from $250 to $325 an hour. Former Trustee's Ex. G.

## IV. APPLICABLE LAW AND GUIDELINES

### A. Relevant Statutes, Bankruptcy Rules, Local Bankruptcy Rules.

Fees for trustees in Chapter 7 cases are governed by Bankruptcy Code §§326 and
330.[13]  Section 326(a) fixes the maximum compensation that may be paid to a trustee and

---

[12] The Former Trustee subsequently adjusted his request downward to 256 hours in recognition
of a double entry on the time record for October 27, 1999. Tr. 8/2/11 p. 95.

[13] The United States Trustee has suggested that the Former Trustee's fee needs to be
determined under a *quantum meruit* standard since §326(a) limits compensation to situations where a
trustee has disbursed or turned over moneys.  However, courts that have applied the *quantum meruit*
theory to the award of fees to a trustee have generally done so when the case is converted from one
chapter to another, usually from Chapter 7 to Chapter 13.  See, *In re Main Realty & Management, LLC.*,
277 B.R. 1, 4 (Bankr. D.Conn. 2002); *In re Scott*, No. 05 B 10001, 2006 Bankr. LEXIS 2360 *4 (Bankr.
N.D. Ill. March 7, 2006).  When courts have dealt with the situation of multiple Chapter 7 trustees but
only one trustee having disbursed funds, the better reasoned decisions have interpreted the word
"trustee" in the last section of §326(a) as referring to all trustees serving in the case under Chapter 7 and
have determined the maximum compensation to all trustees on the aggregate distributions made by one
or both trustees. Their combined fees however, are barred by §326(c) from exceeding the overall cap of
§326(a). *In re Rodriguez*, 240 B.R. 912, 915-916 (Bankr. D. Colo. 1999); *In re Arius, Inc.*, 237 B.R. 843,
845 (Bankr. M.D. Fla. 1999). ("The proper method of calculating a trustee fee cap involving the service
of more than one trustee within a single chapter of the Bankruptcy Code is to include all disbursements
during the administration of the case.") That method, in fact, has been the prior practice of this Court.

states:

> (a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.
> . . . .

> (c) If more than one person serves as trustee in the case, the aggregate compensation of such persons for such service may not exceed the maximum compensation prescribed for a single trustee by subsection (a) or (b) of this section, as the case may be.

Bankruptcy Code §330 establishes the standards for the awarding of fees and expenses and authorizes the court to award after the fact reasonable compensation for services rendered:

> (a) (1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103 –
> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and
> (B) reimbursement for actual, necessary expenses.
> (2) The court may, on its own motion or on the motion of the United States Trustee for the District or Region, the trustee for the estate, or any other party in

26

interest, award compensation that is less than the amount of compensation that is requested.

(3)(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including–

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged comparably skilled practitioners in cases other than cases under this title.

(4) (A) Except as provided in subparagraph (B), [referring to cases in Chapters 12 and 13] the court shall not allow compensation for –

(I) unnecessary duplication of services; or

(ii) services that were not–

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

11 U.S.C. § 330(a)(1), (2), (3) and (4)(A) (1994)[14]

---

[14] This was the language of section 330 in effect at the time the instant case was filed in 1996 and will be applied accordingly. Under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, ("BAPCPA"), Congress amended Bankruptcy Code §330(a)(3) to no longer make consideration of the factors set forth therein mandatory in the case of Chapter 7 trustees. It also added §330(a)(7) which states "[i]n determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326."

The Former Trustee suggests that his fee request should be treated as a commission in accordance with the 11 U.S.C. §326(a) and §330(a)(7), arguing the latter's retroactive applicability to pending cases, therefore permitting the court to consider the trustee's fee request without consideration of his time records. It is not necessary for the Court to determine the retroactive effect of such changes

Rule 2016(a) of the Federal Rules of Bankruptcy Procedure, (hereinafter, "Bankruptcy Rule(s)"), provides in relevant part,

> (a) *Application for Compensation and Reimbursement. A*n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a *detailed statement* of (1) the services rendered, *time expended* and expenses incurred, and (2) the amounts requested. (emphasis added).

Supplementing Bankruptcy Rule 2016, Local Rule 2016-1(a) and (3) of the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the District of Connecticut (hereinafter, the "D.Conn. LBR_- _"), to insure the accuracy of the "detailed statement" called for by Bankruptcy Rule 2016(a), requires, "all applications for compensation to . . . trustees . . . contain" *inter alia*, "[a] typed time sheet, based upon records *prepared contemporaneously with the services rendered*. . . ." (emphasis added). In addition, to assist the Court in determining the amount of "reasonable compensation for actual, necessary services rendered," *see* §330(a)(1)(A), considering "the nature, the extent, and the value of such services taking into account all relevant factors" to be

---

however, because notwithstanding Congress' changes, §330(a)(1) still requires the court to determine the reasonableness of the Chapter 7 trustee's fee request. Section 330(a)(2) permits the court "on its own motion or on the motion of the United States Trustee . . . [to] award compensation that is less than the amount of compensation that is requested," and §330(a)(4) still requires the court to disallow compensation for duplicative services and services that were not reasonably likely to benefit the estate or necessary to its administration.

Further, courts that have considered the retroactivity question, have held that regardless of the changes in the Code sections, they still have the discretion to consider the §330(a)(3) factors in determining what is reasonable compensation under the §326(a) commission scheme, including an examination of a trustee's time records. *See e.g.*, *In re Ward*, 418 B.R. 667, 673-674 (W.D. Pa. 2009) and cases cited therein. In *In re B & B Autotransfusion Serv. Inc.*, 443 B.R. 543, 551 (Bankr. D. Idaho 2011), the court stated, notwithstanding the change to §330(a)(3), "Knowing what a trustee *did* in a case - that is to say an itemization of the services rendered - is essential."

Moreover, even were the Former Trustee given the advantage of every arguable BAPCPA fee consideration benefit, including having his fee application given an initial presumption of reasonableness under new §330(a)(7), for the reasons otherwise discussed herein, he still would suffer the same fate of complete denial of his fee application.

considered pursuant to §303(a)(3)(A)-(E), *inter alia*, and determining services not eligible

for compensation under §303(a)(4)(A), D.Conn. LBR 2016-1(a)(3), requires that the

contemporaneously prepared time sheets set forth, *inter alia* :

> (a) The dates the services were rendered;
> (b) A description of services in sufficient detail to enable the
> court to find that such services were actual and necessary;
> (c) The time spent rendering each service broken down into
> tenths of an hour  . . . .

D.Conn. LBR 2016-1(a)(3)(a-c).

### B. United States Trustee Guidelines

In addition to the above mentioned statutes and rules, although not binding on the

Court, the U.S. Trustee Guidelines for Reviewing Applications for Compensation &

Reimbursement of Expenses filed under 11 U.S.C. §330, reprinted at 28 C.F.R. Part 58,

Appendix, *see also* Debtors' Ex. A-63, are instructive. For example, as they concern

"lumping", discussed hereinafter,  they state: "[s]ervices should be noted in detail and not

combined or "lumped" together, with each service showing a separate time entry; however

tasks performed in a project which total a de minimus amount of time can be combined or

lumped together if they do not exceed .5 hours on a daily aggregate," at (b)(4)(v).

### C. Applicable Case Law

Case law related to bankruptcy trustee fee applications is extensive but, as the

language of the applicable statutes and rules is plain and straightforward, that case law

simply supplements those statues and rules. The decision to award fees rests within the

sole discretion of the court and will not be disturbed by an appellate court absent a

showing that it was abused.  *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM,*

*Inc.)*, 210 B.R. 19, 23 (2d Cir. BAP 1997). The trustee bears the burden of proving the

reasonableness of the fees requested under §330(a), and has the responsibility to file an

application supported by sufficiently detailed records of the time spent and the matters

addressed.[15]  *Roderick v. Levy (In re Roderick Timber Co.)*, 185 B.R. 601, 606 (9th Cir.

BAP 1995); *In re Columbia Plastics, Inc.*, 251 B.R. 580, 584 (Bankr. W.D. Wash. 2000).

Any uncertainties due to poor record keeping are to be resolved against the fee applicant.

*In re Poseidon Pools of America*, 216 B.R. 98, 100-101 (E.D.N.Y.1997). Because time

records that are not recorded at the time services are provided cannot be considered

reliable, courts have reduced or denied fees in their entirety when such records are not

kept.  *Scott v. City of New York*, 626 F.3d 130, 133 (2d Cir. 2010); *New York State Ass'n*

*for Retarded Children, Inc., v. Carey*, 711 F.2d 1136 (2d Cir. 1983); ("All applications for

attorney's fees . . . should normally be disallowed unless accompanied by

contemporaneous time records, indicating for each attorney, the date, the hours expended,

and the nature of the work done.").  *Carey* at 1154.

## V. DISCUSSION AND ANALYSIS

The Former Trustee, on three separate occasions, and for different purposes,

prepared three sets of time records reflecting services performed in the amount of 97.5

hours (hereinafter, the "BMS Time Records"), 497.5 hours (hereinafter, the "Supplemental

Time Records"), and 260.1 hours (hereinafter, the "Filed Time Records"). The BMS Time

---

[15] Of course, unlike here, in those instances where a trustee is operating an ongoing business on a day-to day basis, the court may excuse a trustee from maintaining time records as meticulously as it would require of an attorney.  *See e.g., In re Missionary Baptist Foundation of America*, 77 B. R. 552, 554 (Bankr. N.D.Tex. 1987).

Records were provided to the Successor Trustee; the Supplemental Time Records were provided to all the interested parties but were not filed with the Court;[16] and Filed Time Records were filed with the Court and served on the parties as part of the Fee Application. While the BMS Time Records were provided to the Successor Trustee, the Former Trustee made it clear to the Successor Trustee that they were incomplete and would be followed by supplemental records reflecting additional time for services rendered. Accordingly, the BMS Time Records play a relatively minor role in the Court's consideration of the Fee Application. Ordinarily, time records filed with the court in support of a fee application – in this case, the Filed Time Records – are the only time records considered in assessing the appropriate amount of a fee award. Accordingly, the Court will first examine the Filed Time Records. Nevertheless, due to the rather unique circumstances attending the present matter, the Supplemental Time Records are of real significance in the ultimate fee calculus.

## A. The Filed Time Records

### 1. Absence of Contemporaneous Records

The Former Trustee admitted at the Fee Hearing under questioning by the Court that the time entries in the Filed Time Records submitted with the Fee Application were not recorded contemporaneously with the services rendered.

> The Court: The time records that you submitted were not made contemporaneous with the event they purport to represent. You agree with that?
> Mr. Daly: I would agree with that, your honor.

---

[16] The Court received and reviewed the Supplemental Time Records incident to the Fee Hearings. U.S. Trustee Ex. E.

31

Tr. 8/3/11; p. 111.

The absence of records prepared contemporaneously with the services for which

the Former Trustee seeks compensation suggests defiance, or at best deliberate

indifference, to the contemporaneous record requisite of D.Conn. LBR 2016-1(a)(3).[17]

And, while the Former Trustee testified he prepared the Filed Time Records from notes he

had retained from when he prepared his semi-annual reports, reviews of the state court

and bankruptcy court dockets, "his memory of pleadings," from information received from

the Successor Trustee who had the file and also discussed the case with others, Tr. 8/2/11

pp. 92-93, not surprisingly, the Filed Time Records are replete with errors, duplications,

misstatements of time spent, and "lumping" of time spent on services. "[I]n sufficient

---

[17] The Former Trustee argues that since special counsel for the Former Trustee (Attorney Margol and co-counsel in the State Court Action) were not required by the U.S. Trustee to produce contemporaneously prepared time records in connection with their fee applications, there is no legitimate basis for treating him differently. However, as the Former Trustee is well aware, special counsel were all appointed on a contingency fee basis. As is typical in such cases, the lead personal injury attorney for the Debtors undertook a major financial risk in prosecuting the State Court Action. Over the course of the litigation, Attorney Margol expended in excess of eight hundred thousand dollars to pay costs related to investigating the facts, including depositions, transcripts, mailings, telephone, travel, witness fees, printing, court charges and interest on loans taken out to support the litigation. Tr. 8/2/2011 pp. 111-112. He and his co-counsel represented the Debtors through two months-long trials and two appeals that culminated in Connecticut Supreme Court decisions.

Further, although the draft order of appointment prepared by the Former Trustee and later approved by the Court, references special counsels' appointment as being pursuant to Bankruptcy Code §328(b), it is clear that the Former Trustee meant to refer to §328(a), which authorizes a court to pre-approve the terms and conditions of the retention of counsel. Each order of appointment indicated that counsel's compensation was to be "contingent in nature," and each motion stated that compensation was to be based upon "33 and1/3% of any settlement received." U.S. Trustee Ex. V V, XX, YY, Z, AAA, BBB, CCC, and DDD.

Under §328(a), a court's "power to amend those terms is severely constrained." *In re Smart World Techs., LLC*, 552 F.3d 228, 232 (2d Cir. 2009). A bankruptcy court may only vary the compensation from what is provided in the retention order "if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *Id.* at 232.   The Second Circuit expressly stated that the §328a) and §330(a) inquiries are "mutually exclusive," as "'[t]here is no question that a bankruptcy court may not conduct a §330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. §328. *In re B.U.M. Int'l, Inc.*, 229 F.3d 824, 829 (9th Cir. 2000).'" *Id.* at 233.   No formal written objections to special counsels' fee applications were filed in this case.

32

detail," *see* D.Conn. LBR 2016-1(a)(3)(b), "prepared contemporaneously," *see* D.Conn. LBR 2016-1(a)(3), time records enable the Court to determine the reasonable value of the relevant services, whether such services were actual and necessary, and to meaningfully apply other standards of §330(a). Time records prepared in whole or in part on "memories," and "discussions with others," especially where the case is, as here, fifteen years old, disable the Court from determining the amount of reasonable compensation to be awarded pursuant to §330.

As to the Former Trustee's testimony that some of the time entries were prepared from his review of docket entries, the Court recognizes that reliance on official docket entries may justify an award of compensation for services verified and supported by those entries to the extent those records serve as a reliable, contemporaneous indicators of compensable hours. *See e.g., Scott v. City of New York*, 643 F.3d 56, 59 (2d Cir. 2011). However, while the Former Trustee testified generally that he reviewed state and bankruptcy court dockets in preparing certain time entries, no particularization of that effort was provided. Accordingly, without such further detail, the Court is not positioned to award even limited compensation based upon docket entries.

From the outset, the Former Trustee's noncompliance with D.Conn. LBR 2016-1(a)(3)'s contemporaneous and detailed record requisites preclude the Court from properly evaluating the relevant factors set forth in §330(a) and thereby determining an appropriate award of compensation.

### 2. "Lumping" or "Block Billing" of Services

"Lumping" or "Block Billing" refers to the practice of combining multiple, unrelated

33

time entries for discrete tasks performed, without identifying the amount of time spent on each.  It is often, but not always, a product of the failure to keep records prepared contemporaneously and the related inability of the timekeeper to determine *after the fact* how much time was spent on a particular entry. "Lumping" makes it difficult for a court and parties in interest to determine if the amount of time spent on a particular activity was reasonable and valuable to the estate.

A review of the time records submitted by the Former Trustee with his application reveals that of the148 separate entries that make up the 260.10 hours listed on the time records, at least 41 of those entries are "lumped."[18]

---

[18] Random examples of such lumping include:

07/05/96  Review correspondence regarding claim against crossroads, draft and forward application to employ Attorney John Grillo as special counsel  1.50 hours;

03/28/99 Review file, court docket at Court and do legal research regarding facts surrounding this personal injury claim and telephone calls with Attorney Margol and  Attorney Moore  6.00 hours;

05/19/99  Draft new applications to retain counsel, Rodney Margol and Garrett Moore and discuss with counsel and forward; Review file and discuss case with John Grillo and update files for semiannual report  3.90 hours;

11/20/99  Update files and close case against Cross Roads Development on Form 1.  Case lost on liability issues and discussed with Attorney Grillo and no appeal. Attorney Grillo advised that he discussed with client and no need for abandonment since Dilieto does not want to appeal. Review Order denying Motions for Protective Order and review conditions and serve same. Update file for annual report. 3.00 hours;

09/18/00  Discuss case with Rodney Margol and the issues on appeal.  Draft application to retain Bill Gallagher as special counsel to estate for appellate purposes and if retrial is needed  3.00 hours;

9/30/02  Quarterly Update, review files and discuss with Rodney Margol 1.0 hour;

08/10/06  Review Memorandum of Decision and Notice of Appeal and draft memo to Bill Gallagher regarding retention as appellate counsel.  2.90 hours;

03/02/09  Review file and update Form 1. Telephone conversation with Rodney Margol and verify no change in status  10.00 hours.

The Former Trustee's "lumped" entries demonstrate the importance of a time record being maintained for each discrete activity, as these entries preclude the Court or parties in interest from determining if the time spent on any particular activity is excessive, or accurate. For example, on "3/2/99," the Former Trustee indicated that he spent 6 hours (I) "reviewing file" and (ii) "court docket," (iii) researching "facts surrounding the [State Court Action]," and (iv) on telephone calls with Attorney Margol and Moore.  But this lumped entry and its additional failure to set forth time in "tenths of an hour," *see* D.Conn. LBR 2016-1(a)(3)(c), *inter alia*, precludes an assessment of the amount of time spent on the telephone. Was it much as 5.9 hours, or as little as 0.10 hours?  This is particularly important here as the Former Trustee's credibility regarding the extent of conversations and contact with Attorney Margol was seriously questioned by that attorney at the Fee Hearing. Tr. 9/2/11 pp. 182-183.

In cases where courts have identified the "lumping" of entries, and were otherwise unable to discern the amount of time devoted to each task, they have denied the allowance of fees for the time spent on the "lumped" entries.  *In re Hirsch*, Case No. 1-02-17966, 2008 Bankr. LEXIS 3377 at 18-19* (Bankr. E.D. N.Y. 2008); *In re Dimas, LLC*., 357 B.R. 563, 576 (Bankr. N.D. Cal. 2006); *In re World Wide Direct, Inc*., 316 B.R. 637, 643 (Bankr. D. Del. 2004)*, In re Ward*, 190 B.R. 242, 246 (Bankr. D. Md. 1995); *In re Poseidon Pools of America*, 180 B.R. 718, 731 (Bankr. E.D.N.Y.1995), *aff'd*, 216 B.R. 98, 100 (E.D.N.Y.1997).

### 3. Duplications, Excessive and Unnecessary Time

The Former Trustee claims to have spent 30 hours attending the first trial of the

State Court Action. In this regard the Filed Time Records reflect:

> 05/03/00-06/01/00  Attendance at medical malpractice trial in
> case Michael J. Daly, Trustee vs. County Obstetrics, et al.
> 30.0 hours;

Assuming, *arguendo*, that the Former Trustee actually attended thirty hours of state court trial sessions[19] no explanation has been offered either through the time records or at the Fee Hearings as to the *necessity* of his attending that trial. In fact, the evidence indicates the opposite. There were competent personal injury attorneys handling the State Court Action.  Attorney Margol and his co-counsel and associates, as well as Attorney Moore (or one of his associates), regularly attended the State Court Action. And, not only was the State Court Action in the capable hands of other counsel, but the bankruptcy estate's interest in the outcome of the case was minimal considering the amount and number of creditor claims. Moreover, Attorney Margol discouraged the Former Trustee from attending as he did not want the State Court Action jury to be "influenced" by the fact that the injured party, Mrs. DiLieto, was in bankruptcy. Tr.  8/2/11 p. 114.  In fact, the Former Trustee himself testified that "[t]here were no days that he [Attorney Margol] wanted me there." Tr. 8/2/11 p. 54-55.  Assuming the hours claimed by the Former Trustee regarding his attendance at the State Court Action were "actual," the time claimed was not "necessary" as required by ¶330(a)(1)(A).

At the Fee Hearings, the Former Trustee voluntarily reduced the hours for which he was seeking compensation, conceding that he accidentally billed twice for the same

---

[19] As discussed hereinafter, counsel in the State Court Action testified that the Former Trustee's claimed hours of attendance at that litigation, both in the Filed Time Records and the Supplemental Time Records, were false and far beyond the few hours he may actually have been there.

36

activity on October 27, 1999 (in one instance for 2.0 hours; in another for 4.0 hours).
However, the time records also show a duplicate entry for July 19, 2000, in which he
claimed "Attendance at USBC hearing regarding objection to claim 6, 1.0 hours; and on
the same date, "Attend hearing on continued objections to *claims*, 1.8 hours." (emphasis
added).

These entries relate to a one page, single paragraph objection filed by the Former
Trustee on May 12, 2000, to a claim filed by Yale University, on the grounds that the claim
did not specify an amount. The time record entry for May 12, 2000, shows .40 hours in
preparation of the objection.  A hearing was set on the objection for June 21, 2000. On that
date, the objection was continued to June 28, 2000, the time record showing 1.0 hour of
time and another 1.0 hour of time when it was again continued to July 19, 2000.  On July
19, 2000, a one page single paragraph order was entered allowing Yale University's claim
in the amount of $2,535.00.

A week after the filing of the objection to the Yale University claim, another time
entry states "5/17/00 Review claims at court and note objections and return to office and
draft and file objections to claims.  4.00 hours."  However a review of the court docket
reveals that there were no objections to claims other than Yale University's filed by the
Former Trustee, not in 2000 nor any year thereafter. The only further objection to claims
that were filed in the case were those filed by the Successor Trustee in the year 2010.
Thus, the Former Trustee claimed a total of 9.2 hours of trustee time at $250 an hour,
totaling $2,300.00, all expended objecting to a single claim for $2,535.00. On December
10, 2010, the same claim (Claim No. 6) was objected to again by the Successor Trustee

37

and, absent a response this time, was disallowed. Finally, it should be noted that the Former Trustee's objection to Yale University's claim was filed prematurely. At the time it was filed, the bankruptcy estate had no assets and would have none unless Mrs. DiLieto were successful in the State Court Action, a very uncertain proposition in the year 2000.[20]

A time sheet entry for July 17, 1996, states, "Review Order authorizing Retention of Counsel and serve same on all creditors .80." However, according to the bankruptcy court docket, service on creditors was not made until November 18, 1996. On February 5, 2000, a time entry states "Serve order appointing Attorney Pennington and notify Attorney Margol of same .50 hours." However, the bankruptcy court docket indicates that service of notice of the entry of the order was made by the Clerk's Office. There is no entry on the court docket or in the file itself indicating that the Former Trustee made such service.

An October 8, 1999, time entry states, "Draft and File Motion for Protective Order re: Deposition by Yale University 1.30." Also on October 8, 1999, there is an entry that states "Discuss case with Attorney Belford and draft motion for protective order for Michelle DiLieto 1.00 hours." On October 25, 1999, an entry states, "Review opposition brief filed by Jim Craven re Motions for Protective Order and review cases and prepare for argument 4.90 hours". Finally, on October 27, 1999, the entry states, "Attendance at USBC Hearing re Motion by Debtor for Protective Order 2.00 hours". (A duplicate entry for 4.0 hours was deleted from the time records). Thus, the Former Trustee claimed a total of 9.20

---

[20] Bankruptcy Code § 704 sets forth the duties of the trustee. Subsection(a)(5) requires the trustee to object to claims but only "if a purpose would be served."

38

hours for time spent by him in preparing and prosecuting two motions for protective orders. However, a review of the actual documents filed in the case show that the motions for protective orders were filed not by the Former Trustee but by Richard Belford, bankruptcy attorney for the Debtors and by Stephen Jacques, an associate of Attorney Moore.

The entry of February 19, 2000 states, "Review memorandum in opposition to dismiss and discuss with Rodney Margol. 4.00 hours." There is a follow up entry on March 11, 2000 that states, "Read Judge Sheldon's decision regarding Plaintiff motion to dismiss and review of the laws of pleading. Send message to other Trustee's. 3.50 hours". While 7.50 hours could conceivably have been spent on the these matters, they did not occur on the dates listed on the time records: Judge Sheldon's decision had been issued almost a month before the first entry on January 27, 2000. Tr. 8/2/11 pp. 110-111. This mixup of dates, (assuming that is all it is), is but another example of the Former Trustee's carelessness in preparing his Filed Time Records and a further reflection of his lack of respect, bordering on contempt, for the requirement that trustees and other professionals maintain accurate, contemporaneous time records. Nor was there any reason for the estate to be charged for the time spent allegedly on March 11th, sending copies to other panel trustees.

The time entry of November 20, 1999, in addition to being "lumped," reports a lengthy conversation with Attorney Grillo concerning the loss at trial in the Cross Roads Development case. According to Attorney Grillo's testimony at the Fee Hearings, the conversation could not have occurred as described because the verdict on the lawsuit was not announced until March 15, 2000, four months later. Tr. 9/29/11 pp. 200-201.

39

Moreover, Attorney Grillo credibly testified that he had never had lengthy telephone conversations with the Former Trustee, notwithstanding time entries to the contrary on May 12 and November 1, 1998, May 19, 1999, and the above mentioned November 20, 1999.

### 4. Questionable, Inflated and False Time Entries

The Court's previous determination that "[a]ssuming the [30] hours claimed by the Former Trustee in the Filed Time Records regarding his attendance at the trial of the State Court Action were "actual," the time claimed was not "necessary" as required by ¶330(a)(1)(A)", is only one reason why the Former Trustee cannot be awarded compensation for this time. Without specific dates and times, it is impossible for the Court to properly credit these hours, that is to determine if they were "actual."

Moreover, Attorney Margol, testifying at the Fee Hearing, denied having seen the Former Trustee more than once or twice at state court during trial, Tr. 8/2/11 p. 114, and further testified that he only recalled the Former Trustee attending the opening statements for the first trial of the State Court Action. *Id*. Indeed, as previously discussed, Attorney Margol did not want the Former Trustee at the State Court Action at all. Attorney Margol's recollection is consistent with the Former Trustee's BMS records, some of which were prepared closer in time to the actual events. They show only one entry of 8 hours, reflecting the Former Trustee's attendance on the first day of trial.

While the time entry for May 15, 1999, referenced a two hour telephone conversation between Attorney Margol and the Former Trustee, at the Fee Hearings, Attorney Margol denied such a lengthy conversation ever took place. Tr. 9/2/11 p.182-183. Additionally, Attorney Margol denied ever having a telephone conversation with the Former

40

Trustee for longer than half an hour, notwithstanding twenty-seven separate time entities

(March 27 and 28, April 15 and May 19, 1999, January 20, February 19, March 18,

September 15 and November 15, 2000, November 20, 2001, September 30 and November

21, 2002,  February 16 and July 29, 2003, January 9 and February 17, 2004, May 23,

June 2, November 15 and 29, 2005, May 3, 2006, January 15 and  July 10, 2007, March

2, June 17,18, and 23, 2009), indicating many conversations of one or more hours of

length. *Id*. Other participants identified in the time records as being engaged in telephone

conversations also denied participating in calls exceeding a few minutes at a time.[21] Of

course, because many telephone call entries were "lumped" with other activities, it is

impossible to tell how long the conversations actually were.

Other entries, particularly those reporting time spent preparing case status reports,

otherwise called "Form 1," also appear to be inflated.  For many years, the Former Trustee

was required to perform very few services in the case: the years 1997 and 1998 each show

only two entries, the year 2001 only one, the years 2002 and 2005, each only six.  In 2001

and 2002, the only activities reported were the preparation of status reports.  No funds

were recovered for the estate until after his services as trustee had ceased and there was

only one lawsuit pending during most of the trusteeship.  Each report only required an

update from the report previously filed. Yet in 2002, the Former Trustee reported spending

a total of 4.3 hours preparing status reports; 1.5 hours in 2005; approximately 4.3 hours

in 2006; 3.3 hours in 2007; approximately 3.1 hours in 2008 and approximately 17 hours

---

[21] *E.g.,* Attorney Ecker - no two hour telephone conversation on November 29, 2005; Tr. 9/26/11
pp.165-166); Attorney Gallagher - no four hour conversation on September 15, 2000; Tr. 9/26/11 p. 81.

in 2009.[22]

The absence of contemporaneously prepared time records, coupled with lumping, duplications, mistakes, claims for unnecessary time, and intentional time inflation attending the Filed Time Records are fatal to the Former Trustee's Fee Application.

### B. The Supplemental Time Records

While the deficiencies related to the Filed Time Records alone warrant denial of the Fee Application, the Former Trustee's preparation of the Supplemental Time Records and the transmittal of those records in November 2010 to the Successor Trustee, counsel in the State Court Action, and Mrs. DiLieto's counsel, Attorney Ecker, is far more egregious.

First, it is transparently obvious that the Supplemental Time Records were fabricated. Comparing the Filed Time Records reflecting 260.1 hours, to the Supplemental Time Records reflecting 497.5 hours, is enlightening. The vast majority of the additional time entries in the Supplemental Time Records can be attributed to an extra 162 hours the Former Trustee claimed were spent attending the first trial of the State Court Action, and 90 hours he claimed were spent attending the second trial. In fact, the Former Trustee acknowledged in testimony at the Fee Hearings that he did not attend the second trial at all. Tr. 8/2/11; pp. 243-245. And, rather than spending 192 hours at the first trial as detailed in his Supplemental Time Records, he testified at the Fee Hearings that he had

---

[22] In cross-examination of the Former Trustee at the Fee Hearings, Assistant U.S. Trustee McCabe elicited testimony from him in which he claimed that on March 2, 2009 he spent 5-6 hours reviewing pleadings for the status report and an additional 2.5 hours preparing the report itself. He also testified that on March 30, 2009, he spent another 1.5 hours on the report and 3-4 hours figuring out how to use the on-line Connecticut Supreme Court docket so that he could check the status of the appeal. Tr. 8/3/99 pp. 65-67.

spent 35 hours at the first trial, although in the Filed Time Records submitted to the Court, he only listed 30 hours and could document the time no better than to "lump" all of the days together.  Tr. 8/2/11 p. 56.

The Former Trustee "defends" the Supplemental Time Records with the assertion that they were *intended* to be considered  "drafts," *not to be relied on by the recipients* as records *to be submitted to the Court*, evidenced, he later claimed, by the fact that they were not submitted to the Court as part of the Fee Application, Tr. 8/2/11 p. 92-94 and therefore, he asserts, these records should play no role in the fee award calculus. The Court finds the opposite.

The Former Trustee acknowledged on cross-examination at the Fee Hearings that he had no supportive evidence supporting his argument that the Supplemental Time Records *were circulated  as drafts*. Tr. 8/3/11 p. 116.  And, none of the e-mails sent by the Former Trustee or his attorney, Attorney Felicetta, at the time these records were distributed, labeled them as "drafts" or mentioned that they were not intended to be an accurate representation of his time spent on the case.  Furthermore, other than the Former Trustee and his former attorney, Carol Felicetta, testifying at the Fee Hearing Hearings that the revised time records were "drafts," no one else who testified, treated or considered the Supplemental Time Records as "drafts," including the two persons with significant interest in the Fee Application – the Successor Trustee and Attorney Ecker, attorney for Mrs. DiLieto. Tr. 8/3/11 p. 280, 9/26/11 pp. 23,146,155 and 162.

Second, it is transparently obvious that the Supplemental Time Records were circulated among the parties as part of an illicit scheme to coerce counsel in the State

43

Court Action to consent to the Former Trustee's Fee Application by the application of a fee calculus that would afford him a fee award comparable in amount to a commission. From the Court's perspective, it is no coincidence that 497.5 hours multiplied by a blended hourly rate in excess of $280 (as set forth in the Filed Time Records) would, if approved by the Court, have entitled the Former Trustee to a fee award approaching the maximum allowable on a commission basis under Code 326(a).

Finally, and most significantly, the circulation of the Supplemental Time Records was attended by and coincident with the Former Trustee's (i) threats to abandon the State Court Action, with allegedly disastrous consequences to the State Court Action and therefore, to Michele DiLieto and the State Court Action counsel, *see* discussions pp. 14-17, *supra*, and (ii) instructions to his newly retained "fee counsel"[23] to "object to all motions" scheduled for hearings on November 17, 2010, including the Successor Trustee's Motion to Pay Surplus [to Michelle DiLieto] and the time sensitive Application to Pay Special Counsel [State Court Action counsel] *see* discussion p. 21, f.n.9, *supra*. For all intents and purposes, having failed to convince those recipients that he was entitled to a fee award based strictly upon a commission, such conduct by the Former Trustee served as a declaration of the war against Michelle DiLieto, her counsel, and the State Court Action counsel.

---

[23] There is no credible evidence in the record suggesting that Attorney Felicetta then had knowledge that the Former Trustee falsified these time records. Attorney Felicetta's involvement in the case lasted for only a couple of weeks and in objecting to the various motions it appears she was merely following her client's instructions.  Attorney Skalka took over representation of the Former Trustee after all of the questionable activities described in this Memorandum of Decision had taken place.

44

Compounding this scenario, is the likelihood that had the Former Trustee coerced or negotiated the consent he was seeking, he then intended to submit these fabricated records, or a modified version thereof, to the Court in support of the Fee Application. In support of this conclusion, the Court notes that the time entries in connection with the two trials in the Supplemental Time Records were listed by day, each day with a different number of hours and were broken down into tenths, so as to appear authentic and in accordance with Local Bankruptcy Rule 2016-1. And the Court, when faced with such detailed records, would have no real way of determining their authenticity *without* objection by counsel in the State Court Action.  Simply stated, had the Former Trustee obtained "consent" to a fee application supported by time records prepared in accordance with Local Bankruptcy Rule 2016-1, both the U.S. Trustee and the Court would have been rendered blind in the examination of material components of the fee award calculus, such as the Former Trustee's false claims of attendance at the second trial of the State Court Action.

Notwithstanding the fact that the Supplemental Time Records were not filed with the Court in support of the Fee Application, the Former Trustee's preparation and circulation of false time records record attended by coercive conduct as discussed herein, demands a punitive response from the Court.

### C. The Former Trustee's Violations of His Professional and Fiduciary Duties

Among the duties of a Chapter 7 Trustee set forth in Bankruptcy Code §704(a) are the requirements in subsection (1) that he "close such estate as expeditiously as is compatible with the best interests of parties in interest," and in subsection (7) that "unless

45

the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest."

### 1. Failure to Consider Abandonment of State Court Action

The Former Trustee argues that regardless of his time records, he is entitled to a generous fee, equivalent to a commission, if for no other reason than the extraordinary length of his service as trustee, necessitated because of Mrs. DiLieto's lack of standing in the State Court Action. However, it is not clear that his service for all those years was required. Testimony was presented at the Fee Hearings that after Yale filed a motion to dismiss the State Court Action on the grounds that Mrs. DiLieto was not the proper party, Attorney Margol, upon advice of Florida bankruptcy counsel, suggested to the Former Trustee that they might be able to resolve the issue by having Mrs. DiLieto pay off the estate's creditors and then have him abandon his interest in the case.  Tr. 8/2/2011, pp. 190 –191.

In fact, there is a strong likelihood that once the Former Trustee was substituted as plaintiff in the State Court Action, the Superior Court would have permitted him to abandon his interest in the lawsuit and allowed Mrs. DiLieto to resume her role as plaintiff. The Connecticut Supreme Court decision of June 29, 2010, (discussed at p. 19, *supra*), restated long-standing principles in concluding that because the failure to name the Former Trustee as plaintiff at the outset of the suit was ruled a "mistake," the substitution of the real party in interest as permitted by Conn. Gen. Stat. §52-109, cured any jurisdictional defect in the action resulting from the original plaintiff's lack of standing, (although it did not apply retroactively to the offer of judgment statute, which it held must

46

be applied with reasonable strictness since it was punitive in nature).

> The Supreme Court stated that:
>
> > [R]emedial statutes such as §52-109 'must be liberally construed in favor of those whom the legislature intended to benefit.' . . . (citation omitted). This court has stated that once such a determination is made, as it was in the present case, the substituted party 'is let in to carry on a pending suit, and is not regarded as commencing a new one. After he is substituted he is . . . treated and regarded for most purposes just as if he had commenced the suit originally. The writ, the complaint, the service of process, attachment made, bonds given, the entry of the case in court, the pleadings if need be, in short all things done in the case by or in favor of the original plaintiff . . . remain for the benefit of the plaintiff who succeeds him, as if done by and for him originally and just as if no change of parties had been made. . . . *Bowen v. National Life Assn.*, 63 Conn. 460, 476-77 (1893).'  (full citation provided).

*DiLieto v. County Obstetrics*, 297 Conn. at 149 -152.

Court decisions considering the effect of a cause of action arising before the filing of bankruptcy have all emphasized that the debtor lacks standing to file the suit *in the absence of an abandonment by the trustee* under Bankruptcy Code §554.  *Calabrese v. McHugh*, 170 F. Supp. 2d 243, 256 (D. Conn. 2001);  *Chapple v. Fahnestock & Co.*, No. 03-04989, 2006 U.S. Dist. LEXIS 62664, at *6 (E.D.N.Y. September 1, 2006).  Even unscheduled property may be abandoned, as long as notice and a hearing are provided as required in §554(a) and (b).  *Tilley v. Anixter, Inc.*, 332 B.R. 501, 508 (D. Conn. 2005); *Correll v. Equifax Check Servs.*, 234 B.R. 8, 10 (D. Conn. 1997).

Read together with the Supreme Court decision, these cases strongly suggest that once the Former Trustee was made a party to the malpractice action, he would have been free thereafter to abandon the cause of action and allow Mrs. DiLieto to be substituted as

47

plaintiff.  As a bankruptcy attorney of long standing, the Trustee should have seen that

possibility and could have communicated it to attorneys Margol and Ecker who were

unfamiliar with bankruptcy law and practice.   If the Former Trustee had accepted her offer

to pay off the creditors in the estate, they would not, eleven years later, still be waiting to

have their claims paid and Mrs. DiLieto would not be forced to pay fourteen years worth

of interest.  *See* Bankruptcy Code §726(a)(5) (requiring the payment of interest from the

petition date in solvent estates).

By remaining as trustee however, the Former Trustee preserved his right to what

he thought would be a very generous fee in the event the malpractice suit was successful.

From the shock and anger he displayed in his e-mails beginning in 2006 when Mrs. DiLieto

began demanding that he show documentation to support his future fee request, it is clear

he had assumed that the parties would be so grateful for his "saving" the State Court

Action, that no one would consider objecting to a fee request based upon the full

commission allowable under §326(a).[24]  In sum, his unwillingness to consider this

possibility and in fact, his repeated suggestions as to the dire consequences that would

result if he were to abandon the estate's interest in the State Court Action, can only be

seen now as a tactic to retain a personal interest in the outcome of that litigation in the

---

[24] Throughout the e-mail correspondence (not all of which is reproduced in this decision), there are comments from the Former Trustee to the effect that Mrs. DiLieto should be grateful to him for saving her State Court Action, not just because in the absence of his willingness to file an *Affidavit* on her behalf the State Court Action would have been dismissed, but also because he filed it notwithstanding his personal belief that she failed to disclose the existence of her claim deliberately.  Attorney Ecker testified at the Fee Hearings that in a conversation with the Former Trustee on November 25, 2008, during which he kept notes, the Former Trustee described Mrs. DiLieto as "a pig just like the other white trash who file . . . and then later don't want to pay anyone out of personal injury cases.  Not all, but 99 percent of them." Tr. 9/26/11 pp. 179-180.   If he did believe that Mrs. DiLieto deliberately failed to schedule her interest in the claim he should not have signed the *Affidavit* in which he stated, *inter alia,* that he believed "she had a good faith basis for not listing it."  *See* p. 8, *supra*.

48

hope of receiving a sizeable trustee's fee.

### 2. Failure to Furnish Debtors With Information Reasonably Requested

It has been clear since the Former Trustee became aware of the State Court Action

that a monetary recovery therein would be attended by a strong likelihood that the

bankruptcy estate would be the beneficiary of substantial surplus funds, and therefore, that

the Debtors were the real parties in interest. *60 E. 80th St. Equities, Inc. v. Sapir (In re 60*

*E. 80th St. Equities, Inc.),* 218 F.3d 109*, 115-116 (2d Cir. 2000); In re Vebeliunas,* 231

B.R. 181, 189-90 (Bankr. S.D.N.Y. 1999), *appeal dismissed*, 246 B.R. 172 (S.D.N.Y. 2000);

*In re George Schumann Tire and Battery Co., Inc.*, 145 B.R. 104, 107 (Bankr. M.D. Fla.

1992). As such, the Former Trustee had a duty to cooperate with the Debtors and furnish

them with as much information as was reasonable. When he was approached by Mrs.

DiLieto in 2006 with a request for the amount of his trustee's fees, she was entitled to  a

prompt and straightforward answer. Instead, the Former Trustee took six weeks to

respond and when he did so, misled her, and later Attorneys Margol and Ecker, knowing

they were unfamiliar with bankruptcy law, by telling them that his fee was entirely statutory

and solely based upon disbursements made to creditors and administrative claimants.

Thereafter, when Attorney Ecker, relying on his representation, sought to ascertain what

those disbursements would likely be, he refused to answer, claiming that the request was

premature and too time-consuming. In fact, if the Former Trustee had maintained the

contemporaneous time records he was obligated to maintain, supplying the information

would have been a quick and easy task. Further, as far as the time it would take to identify

future disbursements, aside from possible attorney's fees, the actual unsecured creditor

claims filed in the case numbered no more than five.

### 3. His Breach of Ethical Standards As an Attorney

As a Chapter 7 Trustee,  Mr. Daly was an officer of the court and a fiduciary. *Lebovits v. Scheffel (In re Lehal Realty Assocs.),* 101 F.3d 272, 276 (2d Cir. 1996)*; In re Gorski*, 766 F.2d 723 (2d Cir. 1985).  "These fiduciary duties are owed not only to the entire creditor body but to the debtor as well." *In re Vebeliunas,* 231 B.R. at 192.  He had "a duty to exercise that measure of care and diligence that an ordinary prudent person would exercise under similar circumstances*."   In re Rigden*, 795 F.2d 727, 730 (9th Cir. 1986).  As an attorney practicing in this Court, he was also bound by the Conn. Rules of Professional Conduct (hereinafter, the "Rules of Profession Conduct").[25]    Rule 3.1 of the Rules of Professional Conduct prohibits an attorney from bringing or defending  a proceeding  or asserting or controverting an issue unless there is a basis in law or fact for doing so that is not frivolous. The Former Trustee's assertion to attorneys and parties in interest and to this Court, that he had an objection to special counsels' fee applications, represents his use of a legal procedure solely to pressure special counsel to consent to his Fee Application to the potential prejudice of Mrs. DiLieto.

Rule 4.1(1) of the Rules of Professional Conduct prohibits an attorney from making a false statement of material fact or law to a third person.  The Former Trustee repeatedly told Mrs. DiLieto and Attorneys Margol and Ecker that his fee was based upon

---

[25] Rule 83.2(a) of the Local Civil Rules of the United States District Court for the District of Connecticut, applicable in this case by D. Conn. LBR 1001-1(b), with exceptions not relevant here, "recognizes the authority of the 'Rules of Professional Conduct,'as approved by the Judges of the Connecticut Superior Court as expressing the standards of professional conduct expected of lawyers practicing in the District of Connecticut."

disbursements in the case, knowing that the statement was only partly true.  In the Official

Commentary to this Rule it states: "Misrepresentations can also occur by partially true but

misleading statements or omissions that are the equivalent of affirmative false statements."

Additionally, the Former Trustee prepared and circulated among counsel and the

Successor Trustee, the Supplemental Time Records  with time entries he knew were false,

particularly those entries related to his attendance at the second trial of the State Court

Action, which he plainly did not attend. While he claimed that these time records were a

draft, there is nothing inscribed on the time records themselves to indicate that they were

a draft nor were the persons among whom they were circulated so advised.  Nor is there

any legitimate reason to knowingly include false information in "drafts". And, as already

noted, if those time records had not created such a furor of opposition and outrage, it

appears likely they, or a modified version thereof, would have been submitted to the Court

with the Fee Application.   In that event, without objection or critical observation, the

records would appear facially authentic to the Court.

Finally, Rule 8.4 speaks more generally of an attorney's responsibility to  maintain

the integrity of the profession in regard to his *personal* conduct. Rule 8.4(3) identifies

professional misconduct as when an attorney engages "in conduct involving dishonesty,

fraud, deceit or misrepresentation;" Rule 8.4(4) identifies it as such when the attorney

engages "in conduct that is prejudicial to the administration of justice."   In the Official

Commentary to this Rule it states:

> Lawyers holding public office assume legal responsibilities
> going beyond those of other citizens. A lawyer's abuse of
> public office can suggest an inability to fulfill the professional

role of lawyers. The same is true of abuse of positions of
private trust such as a trustee. . . .

It is clear that many of the entries in the Former Trustee's time records submitted

to the Court, and many more submitted to the parties and the Successor Trustee in earlier

versions, were inaccurate, and intended to deceive. Even were these false entries just the

result of extreme, gross negligence, the fact remains that the Former Trustee violated his

fiduciary duty to be candid and trustworthy.

### 4. His Breach of Fiduciary Duties As a Trustee

The Former Trustee's conduct toward Mrs. DiLieto in his use of profane, sexist and

insulting language (not all of which are reproduced in this Memorandum), reflected badly

on him as an attorney representing his profession, as a Chapter 7 trustee duly appointed

by the United States Department of Justice, and as an individual.

His threatening comments toward other counsel, particularly Attorney Ecker,

suggesting he would be "black-balled" from serving as special attorney in future

bankruptcy cases, were highly inappropriate and an abuse of his authority as a Chapter

7 trustee.  His gratuitous comments were not only shared with other attorneys in the case,

but also with members of the panel of Chapter 7 trustees who had no involvement in the

bankruptcy case and no reason to be informed.  His copying of an email to the lead

attorney for the defendants in the State Court Action could have given her hope of a more

favorable settlement, and was particularly egregious.

Finally, he improperly attempted to press Mrs. DiLieto and her attorneys into

agreeing to his fee request by threatening to abandon the State Court Action, and

predicting that as a consequence of his abandonment, the State Court Action would be

52

dismissed. He did so with the knowledge that one, he could not abandon the case without court approval, and two, that even if he was allowed to abandon the case there was a reasonable likelihood that Mrs. DiLieto would be restored as plaintiff and permitted to proceed on her own.

Violations of professional ethics and/or breaches of fiduciary duties permit a reduction, denial or forfeiture of compensation or other sanctions. *Damon & Morey, LLP, v. Slater*, No. 97-CV-0080E, 1998 U.S. Dist. LEXIS 341, at *14-15 (W.D.N.Y. January 14,1998); "[T]he court may deny fees 'on account of such attorney's wrongdoing, negligence, or serious breaches of fiduciary obligations,'" *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.)*, 210 B.R. at 24, *quoting from*, *In re Wild Horse Enterprises, Inc.*, 136 B.R. 830, 844 (Bankr. C.D. Cal. 1991). "[W]here a trustee or attorney for the trustee makes fraudulent statements in the course of seeking an award, all compensation should be denied." *In the Matter of Evangeline Refining Co.*, 890 F.2d 1312, 1323 (5th Cir. 1989). The fact that in the end, the State Court Action was successful, the bankruptcy estate made solvent, and Mrs. DiLieto received a substantial monetary award, does not mitigate the consequences of the Former Trustee's breach of his professional ethics and fiduciary duties. *See, In the Matter of Futuronics Corp.*, 655 F.2d 463, 471 (2d Cir.1981).

## D. Possible Mitigating Circumstances

### 1. Services That Benefitted the Estate

53

The Former Trustee argues that notwithstanding the shortcomings in his time records, the Court should still award him compensation because his services benefitted the bankruptcy estate.  There is no question that certain legitimate work performed by him benefitted the estate.  His handling of the section 341 meeting, review of the bankruptcy schedules and amendments thereto, objections to exemptions, assistance in opposing Yale's motion to dismiss, appointment of counsel and submission of status reports, *inter alia*, all contributed to the administration of the case, ultimately permitting a substantial recovery for the estate and the Debtors.

Nevertheless, the work he actually performed was not unduly complex. He was not required to prepare any complex pleadings or briefs.  He did not have to conduct any trials. Any work requiring the sophistication of an attorney was performed by court-approved counsel, who were selected by others. According to the testimony of Attorney John Grillo who handled the lawsuit on behalf of the Debtors against Crossroads Development, the Former Trustee provided no assistance in the preparation of the briefs or oral argument in the case. Tr. 9/26/11 p.198.  Nor, according to the testimony of William Gallagher, the appellate attorney, did he assist in the preparation of the briefs or oral argument for the appeals of the State Court Action, Tr. 9/26/11 p. 92. The few filings with the Bankruptcy Court, such as the applications for the appointment of counsel, were upon examination, routine boiler plate documents, easily adapted for the occasion, and clearly required less time to prepare than claimed on the time records.

Further, denying the Former Trustee any compensation in this case even where he has conferred some benefit on the estate does not result in a windfall to the estate or

54

Debtors.  By virtue of his resignation, the Successor Trustee was required to devote a considerable number of hours familiarizing himself with the case, and dealing with the contentious issues surrounding the Former Trustee's Fee Application, including reviewing the Former Trustee's inconsistent and inaccurate time records and responding to his efforts to delay allowance of fees for special counsel. Tr. 8/3/11 p. 261.  With respect to the Former Trustee's Fee Application, the Successor Trustee was also required to appear and testify at  a 2004 exam and at the Fee Hearings.  The Court has discretion to take the burden placed on the Successor Trustee into account.  *In re Charter Oak Security Agency, Inc.*, 173 B.R. 456, 458 (Bankr. D. Conn. 1994).

### 2. Serious Unexpected Health Issues

In 2003, there were significant changes in the Former Trustee's health that likely contributed to some of the problems that developed later in the bankruptcy case, particularly as it related to the Former Trustee's increasingly hostile attitude toward counsel in the State Court Action and the Debtors -- most particularly toward Mrs. DiLieto, as discussed above.  He was diagnosed with a rare form of Melanoma, which during the ensuing years required him to undergo multiple rounds of chemotherapy, causing numerous side effects including a partial loss of hearing, a loss of balance (which at one point caused him to fall and break his shoulder) and necessitated his use of a cane.  He had difficulty with his legs. He took several leaves of absence from the Chapter 7 trustee panel. Tr. 8/2/11 pp. 77-80; Tr. 8/3/11 pp. 61,176.   All of this must have placed a severe strain on him mentally as well as physically.

The fact that Mrs. DiLieto did not have cancer but was the object of sympathy and attention and the possible beneficiary of millions of dollars appears to have grated on the Former Trustee who actually had cancer and no one to blame.[26] Nevertheless, while such behavior may to a degree be understandable, it is not excusable, and such unprofessional conduct, coupled with his failure to keep proper time records (which preceded his diagnosis in 2003), and his obvious efforts to extract consent to a full commission-based fee from the Debtors and counsel, by *inter alia*, creating time records out of whole cloth and threats, overrides his entitlement to compensation for the time properly spent.

## VI. CONCLUSION

This is an unfortunate end to a career for a bankruptcy trustee who, until relatively recently, served the Court conscientiously and well. However, his abhorrent performance in this case cannot be excused by past honorable service*,* or his serious health problems and precludes even a limited monetary award for legitimate work performed. Accordingly, and for the reasons discussed in herein, the *Application of Michael J. Daly, Chapter 7 Trustee for Final Allowance of Compensation Pursuant to 11 U.S.C. §330,* ECF No. 184, must be denied. A separate order denying the Fee Application shall enter simultaneously herewith.

Dated: February 28, 2012                                    BY THE COURT


                                                            Albert S. Dabrowski
                                                            United States Bankruptcy Judge

---

[26] In an e-mail discussed earlier, the Former Trustee contrasts the irony of Mrs. DiLieto suing for "not having cancer" with his having cancer. U.S. Trustee Ex. J; *See* p. 14, *supra.*

57